CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

SEP 1 9 2005

JOHN F CORCORAN CLERK
BY·
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

BARBARA BENTLEY,
  Plaintiff

)
)
)  Civil Action No. 2:04cv00071
)

v.

)
)  **<u>MEMORANDUM OPINION</u>**
)

JO ANNE B. BARNHART,
 **Commissioner of Social Security,**
  Defendant

)
)
)  By: Glen M. Williams
) Senior United States District Judge
)

In this social security case, the court affirms the final decision of the Commissioner denying benefits.

## *I. Background and Standard of Review*

The plaintiff, Barbara Bentley, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying the plaintiff's claims for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 1381 *et seq.* (West 2003), and disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2003). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through

application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Bentley filed applications for SSI and DIB on or about November 7, 2002, alleging disability as of April 19, 2002, due to a neck injury that radiated pain down her neck and back. (Record, ("R."), at 42-45, 53, 168-171.) Her claim was denied initially and on reconsideration. (R. at 29-33, 35-37.) Bentley then requested a hearing before an administrative law judge, ("ALJ"). (R. at 38.) The ALJ held a hearing on March 11, 2004, during which Bentley was represented by counsel. (R. at 177-203.)

By decision dated March 19, 2004, the ALJ denied Bentley's claim. (R. at 14-21.) The ALJ found that Bentley was insured for DIB purposes through the date of his decision. (R. at 20.) Furthermore, the ALJ found that Bentley had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 20.) The ALJ found that the medical evidence established that Bentley suffered from a severe impairment, but that Bentley did not have an impairment or combination of impairments listed at or medically equal to one listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 20.) The ALJ also found that Bentley's allegations regarding her limitations were not totally credible. (R. at 20.) After considering all of the medical opinions in the record regarding the severity of Bentley's impairment, the ALJ

found that Bentley had the residual functional capacity to perform medium work.[1] (R. at 20.) Based on Bentley's residual functional capacity, the ALJ found that Bentley was able to perform her past relevant work as both a stocker and sewing machine operator. (R. at 20.) As such, Bentley was not under a disability as defined by the Act at any time through the date of the decision and not eligible for benefits. (R. at 20.) *See* 20 C.F.R. §§ 404.1520(f), 416.920(f) (2005).

After the ALJ issued his opinion, Bentley pursued her administrative appeals, (R. at 9-10), but the Appeals Council denied her request for review. (R. at 4-6.) Bentley then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2005). The case is before this court on the Commissioner's Motion For Summary Judgment, filed January 13, 2005, (Docket Item No. 18), and Bentley's Motion For Summary Judgment filed April 18, 2005. (Docket Item No. 12.)

## II. Facts

Bentley was born in 1955, (R. at 42), which classifies her as a younger person under 20 C.F.R. §§ 404.1563(c), 416.963(c). Bentley completed the eighth grade and obtained a general equivalency development diploma, ("GED"), in 1974. (R. at 181.) Bentley's past work experience includes employment as a stocker and sewing machine operator. (R. at 15.)

---

[1]The regulations define medium work as work that involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, she also can do sedentary and light work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2005).

Case 2:04-cv-00071-GMW-PMS    Document 20    Filed 09/19/05    Page 3 of 22    Pageid#: 62

At her hearing, Bentley testified that she last worked as a stocker at Big Lots. (R. at 181-82.) Bentley stated that she had been employed in this position for four years and 10 months until she began to suffer from neck pain. (R. at 181, 185.) Bentley testified that as a stocker she lifted items of furniture, including tables and picnic tables onto shelves, and unloaded boxes from delivery trucks. (R. at 182-83.) Bentley stated that prior to her position at Big Lots, she worked as a seamstress for Buster Brown. (R. at 183.) Bentley testified that she worked at Buster Brown for four years sewing various garments. (R. at 183-84.) Bentley stated that this position also required lifting, in particular, bundles of dresses that averaged 10-15 pounds but occasionally weighed up to 20 pounds. (R. at 134.)

When asked about her neck pain, Bentley stated that the pain had arisen gradually, and she was unsure whether it had resulted from an injury sustained while working at Big Lots. (R. at 185.) Bentley described the pain as "dull" and surmised that the pain intensity varied according to her activity level. (R. at 185.) Bentley stated that she experienced pain when tilting her head downwards and backwards. (R. at 187.) Bentley also testified that she had difficulty lifting and carrying and could only carry items weighing approximately 10 pounds. (R. at 187.) Bentley stated that sitting for long periods also caused her neck pain, and she had to stand after approximately 30 minutes. (R. at 188.) Bentley testified that she took medication for her neck pain when needed, which completely relieved her pain. (R. at 186.) Bentley stated that she took pain medication approximately twice a month, although occasionally twice a week, and noticed total pain relief within 20-30 minutes of taking the medication. (R. at 186.) Bentley testified that after her pain subsided, she was capable of doing everything she wanted. (R. at 186.)

When asked about other medical problems, Bentley stated that she suffered from

Case 2:04-cv-00071-GMW-PMS   Document 20   Filed 09/19/05   Page 4 of 22   Pageid#: 63

her nerves, which caused numbness in her legs. (R. at 187.) Bentley testified that this numbness often prevented her from walking and standing for long periods, as she was able to stand for only 10 to 15 minutes before she was forced to sit. (R. at 188.) Bentley also indicated that walking caused her leg pain, which in turn, made her neck and back hurt. (R. at 189.) Bentley stated that her leg pain precluded her from walking long distances. (R. at 189.) Bentley testified that her back pain was less severe than her neck pain and was completely relieved with ibuprofen. (R. at 189-90.)

Bentley also stated that she chronically suffered from bronchitis, which is addressed with an inhalant medication. (R. at 190-91.) Bentley further testified that she must avoid dust, pollutants and odors because of her bronchial condition. (R. at 191-92.) As a result of this condition, Bentley stated that she must use an inhaler every day. (R. at 192.)

Bentley then testified that she suffered chest pains on one occasion. (R. at 192.) Bentley stated that her physician ordered a stress test, but the test revealed no problems. (R. at 192.) Bentley also testified that she experienced some acid reflex stomach problems that were completely relieved with medication. (R. at 193.) Bentley further indicated that one doctor diagnosed her with arthritis in the neck and hands, which is alleviated slightly with ibuprofen. (R. at 195.) Bentley stated that her arthritis caused her to have a weak grip, which made her drop items occasionally. (R. at 196.) Bentley testified that she also suffered from osteoporosis, for which she was on calcium-building medication, and allergies. (R. at 197.)

When asked about her daily routine, Bentley stated that she spent most of her time at home. (R. at 193.) Bentley testified that she passed her days doing housework,

except for the vacuuming which required assistance from her husband because the pulling motion bothered her neck. (R. at 193.) Bentley further stated that she is capable of driving alone and went to the grocery store approximately once a week. (R. at 194.) Bentley testified that her only hobby was crafts but that she did not sell anything that she made. (R. at 194-95.) Bentley also stated that she occasionally socialized with friends outside her house but did not belong to a church or any other social organization. (R. at 195.)

Kathy Sanders, a vocational expert, also testified at Bentley's hearing. (R. at 198.) Sanders was asked to consider Bentley's past work experience and to categorize it according to the Regulations. (R. at 199.) Sanders described the position of stocker as "medium and unskilled" and the position of sewing machine operator as "light and semiskilled" with "no transferability." (R. at 199.) Sanders was then asked to consider a hypothetical claimant with Bentley's age, education, past relevant work experience and residual functional capacity. (R. at 199-200.) Sanders testified that there were jobs in the regional or national economy that such an individual could perform, such as cleaner, stocker, bagger, miscellaneous food preparation, ground worker, kitchen worker and hand packer. (R. at 200.) Sanders further stated that there were 9,500 of these jobs in the local economy and 2.5 million in the national economy. (R. at 200.)

Sanders was next directed to the same hypothetical individual but with the limitations as set forth in a Psychiatric Review Technique Form, ("PRTF"), completed by Hugh Tenison, Ph.D. (R. at 200.) Sanders stated that these limitations would have no effect on Bentley's suitability for the jobs listed above. (R. at 201.) Sanders was then asked to assume the same hypothetical individual with the nonexertional limitations as set forth in a psychological evaluation conducted by Sharon J. Hughson,

Ph.D. (R. at 201.) Sanders testified that there were no jobs that such an individual could perform because such an individual suffered from a poor ability to handle stress and was unpredictable and unreliable in interacting in the workplace. (R. at 201.) Sanders was then asked to consider the same hypothetical individual with the ailments described by Bentley in her testimony. (R. at 201-02.) Sanders stated that there would be no jobs in the regional or national economy for such an individual. (R. at 202.)

In rendering his decision, the ALJ reviewed medical records from St. Mary's Hospital; Community Clinic of Norton Community, ("Norton Community"); Stone Mountain Health Services, William A. Davis Clinic, ("Stone Mountain"); Dr. Donald R. Williams, M.D., a state agency physician; Hugh Tenison, Ph.D., a state agency psychologist; and Sharon J. Hughson, Ph.D. (R. at 16-18.)

Bentley was seen in the emergency room of St. Mary's Hospital on March 23, 2003, because she awoke with a stiff neck. (R. at 84.) X-rays of her cervical spine were taken but showed no fractures or subluxations. (R. at 84.) The prevertebral soft tissues showed no swelling, and there was only mild spondylosis at the C4-5 level. (R. at 85.) Bentley was assessed with a cervical flexion/musculoskeletal spasm and prescribed Soma and Motrin. (R. at 84.)

On June 12, 2002, Bentley visited Norton Community for a muscle spasm in her neck. (R. at 94.) After examining Bentley, Dr. Suzanne Ford, D.O., concluded that Bentley's trapezius muscle distribution was very tight, and she was diffusely tender. (R. at 95.) There was no acute point tenderness, edema or cyanosis, and Bentley had +2 reflexes in her arms and legs bilaterally. (R. at 95.) She had full range of motion in all four extremities. (R. at 95.) Dr. Ford diagnosed Bentley with a muscle spasm and arthritis and started Bentley on Flexeril and Celebrex. (R. at 95.)

On June 26, 2002, Bentley returned to Norton Community for a follow-up on the muscle spasm in her neck and complaints of leg numbness. (R. at 92.) Bentley reported that her neck had improved. (R. at 92.) Dr. Ford's examination revealed that Bentley's neck was supple, and there was no lymphadenopathy or muscle tenderness in the trapezius distribution. (R. at 92.) Again, Dr. Ford found no edema or cyanosis. (R. at 92.) Dr. Ford assessed that Bentley's muscle spasms were resolved, but that she still suffered from leg numbness, weakness, arthritis and spondylosis. (R. at 93.) Dr. Ford continued Bentley's use of Celebrex, instructed her to lose weight and showed her some stretching techniques that might alleviate the numbness in her legs. (R. at 93.)

On July 24, 2002, Bentley returned to Norton Community for a follow-up exam for her leg numbness. (R. at 91.) Bentley related to Dr. Ford that she no longer suffered from leg numbness or hip pain but still experienced muscle spasms in her neck. (R. at 91.) Dr. Ford assessed Bentley with spondylosis, muscle spasm and neck pain and switched her medication from Celebrex to Bextra. (R. at 91.)

On October 2, 2002, Bentley returned to Norton Community complaining of neck pain; however, Bentley denied any numbness or tingling in her arms or fingers. (R. at 90.) On a musculoskeletal exam, Bentley had no sensory deficits nor strength deficits in her arms, shoulders or neck. (R. at 90.) Bentley's cervical spine was x-rayed, and it showed mild scattered degenerative spurring anteriorly, mild spondylitic encroachment of the C3-4 level on the right and moderate at the C4-5 level and mild encroachment at the C3-4 and C3-5 levels on the left. (R. at 96.) Dr. Ford diagnosed Bentley with neck pain, muscle spasms in the neck and kyphosis. (R. at 90.) Dr. Ford continued Bentley's prescription for Bextra and started Bentley on Baclofen. (R. at 90.)

On October 23, 2002, Bentley returned to Norton Community for a follow-up exam for her neck pain. (R. at 156.) Bentley had full range of motion in the upper and lower extremities, yet had pain with palpation to the posterior part of the neck around the C3-4 area with full range of motion of her neck. (R. at 156.) Bentley was assessed with spondylosis, neck pain and muscle spasm. (R. at 156.) Bentley stated that Bextra eased her pain, so Dr. Ford gave Bentley Bextra for her neck. (R. at 156.)

On November 20, 2002, Bentley returned to Norton Community stating that the medications were not helping her neck pain. (R. at 87.) She still denied any radiating pain, tingling or numbness in her extremities. (R. at 155.) Bentley showed a decreased range of motion in her neck and was assessed with chronic neck pain. (R. at 155.) She was prescribed Lortab and was sent to an orthopedic physician. (R. at 155.)

On December 23, 2002, Bentley visited Norton Community for a follow-up on her neck pain, which she reported had worsened in the past three weeks. (R. at 153.) Bentley also was experiencing some numbness in her left arm and leg. (R. at 153.) Bentley stated that Lortab helped her pain but that she was out of it. (R. at 153.) A neck exam revealed no lymphadenopathy and no thyromegaly. (R. at 153.) Also, her cranial nerves 2-12 were grossly intact, and her deep tendon reflects were 2/4 bilaterally. (R. at 153.) A musculoskeletal exam revealed full range of motion in her lower extremities, but there was some pain with palpation of the left paraspinal muscles in the cervical region. (R. at 153-54.) Bentley was able to feel light touch in the upper and lower extremities equally bilaterally. (R. at 154.) She also was able to stand on her toes, walk and squat. (R. at 154.) Dr. David Sheppard, D.O., assessed Bentley with chronic neck pain, spondylosis and peripheral neuropathy. (R.

at 154.) Dr. Sheppard prescribed Darvocet and Vioxx. (R. at 154.)

On February 4, 2003, Bentley was treated at Stone Mountain for neck pain radiating into her lower back and shoulders, accompanied by some tingling and numbness in her right side. (R. at 101.) She reported that she had visited the Wise Clinic approximately five or six months prior and they had sent her to Dr. Strang, who diagnosed her with arthritis in her neck with some spurs. (R. at 101.) Dr. Strang had prescribed her Celebrex, which Bentley claimed helped. (R. at 101.) Bentley also complained of symptoms of depression but stated she had never taken any medication for it. (R. at 101.) Bentley also complained of gastroesophageal reflux, for which she took Tums. (R. at 101.) Carol Looney, F.N.P., reported that Bentley was alert, oriented and exhibited good mood and affect. (R. at 101.) A back and spine exam revealed some tenderness in the cervical spine around the C5-6 area but no paraspinal muscle tenderness. (R. at 101.) Looney stated that Bentley had some slight crepitus in the left shoulder but not in the right. (R. at 101.) Looney assessed Bentley with neck pain, radicular neuropathy, gastroesophagreal reflux disease, ("GERD"), and depression. (R. at 101.) Looney prescribed Bentley Celebrex, Nexium, Prozac and Cipro for an ear infection. (R. at 101.) Looney also recommended Bentley attend counseling at Stone Mountain's clinic. (R. at 101.)

Bentley visited Stone Mountain on March 6, 2003, for a follow-up exam. (R. at 100.) She stated that Prozac was helpful for her depression, and Nexium "worked wonders for her stomach." (R. at 100.) Bentley related that she could not take Celebrex because it made her neck hurt worse than without the medication. (R. at 100.) However, Bentley stated that ibuprofen had worked "pretty well" for her neck. (R. at 100.) Looney opined that Bentley was alert and oriented with a good mood and affect. (R. at 100.) A back exam revealed some tenderness, especially at the cervical

spine in the C5-6 area. (R. at 100.) There was no tenderness in the remaining areas of the back or the thoracic, lumbar or sacral areas, even though Bentley complained that when her neck hurt, the pain radiated down her back. (R. at 100.) Bentley was assessed with cervical spondylosis and depression. (R. at 100.) Bentley was instructed to take ibuprofen, apply heat to her neck and perform exercises for her neck. (R. at 100.)

Dr. Donald R. Williams, M.D., a state agency physician, completed a physical residual functional capacity assessment for Bentley dated March 31, 2003. (R. at 119.) Dr. Williams concluded that Bentley could occasionally lift and/or carry items weighing up to 50 pounds, frequently lift and/or carry items weighing up to 25 pounds, stand and/or walk about six hours in an eight-hour workday and sit with normal breaks for six hours in an eight-hour workday. (R. at 120.) Dr. Williams assessed that Bentley was unlimited in her capacity to push and pull, other than as indicated for lifting and/or carrying. (R. at 120.) Dr. Williams formed his opinion against the backdrop of Bentley's claims that a neck injury prevented her from lifting heavy objects or lifting above her head. (R. at 120.) However, Dr. Williams found relevant Bentley's daily activities, which include driving, preparing meals, completing light household chores and shopping and the fact that Bentley needed no help with self-care. (R. at 120.) Dr. Williams's findings were affirmed on July 7, 2003, by Dr. Frank M. Johnson, M.D., another state agency physician. (R. at 126.)

On May 7, 2003, Bentley returned to Stone Mountain and asked that she be given Celebrex again. (R. at 99.) Bentley stated that her neck pain was improving. (R. at 99.)

On July 3, 2002, Hugh Tenison, Ph.D., a state agency psychologist, completed a PRTF on Bentley that assessed Bentley from April 19, 2002, through the date of the review. (R. at 104-18.) Tenison concluded that Bentley's depressive symptoms were nonsevere, resulting in no functional limitations. (R. at 104, 114.) Tenison opined that Bentley's depressive symptoms were effectively treated with Prozac. (R. at 118.) Bentley's daily activities also were noted, and Tenison stated that Bentley's daily activities appeared more restricted due to her physical complaints. (R. at 118.) Tenison documented no serious mental status abnormalities nor functional limitations due to a significant mental impairment. (R. at 118.) As such, Tenison determined that Bentley's allegations were not credible. (R. at 188.)

Bentley returned to Stone Mountain on July 22, 2003, complaining of a cough, sinus congestion and a mild sore throat. (R. at 137.) She denied fever or chills but stated that she was experiencing a lot of postnasal drip and shortness of breath. (R. at 137.) An examination revealed nasal mucosa, erythematous, a mildly congested pharynx and a left cervical lymphadenopathy. (R. at 137.) Bentley was assessed with acute bronchitis, bronchospasms and hyperlipidemia. (R. at 137.) Looney prescribed Avelox, Difil-G and Albuterol MDI. (R. at 137.) Bentley also was given diet counseling for her hyperlipidemia. (R. at 137.)

On August 5, 2003, Bentley visited Stone Mountain for pain in her neck that radiated down her back. (R. at 135.) Bentley also complained of a cough and chest pain. (R. at 135.) Bentley stated that her neck had been feeling better until recently and inquired about another cortisone injection, as the previous one had really helped. (R. at 135.) She also stated that Prozac helped her depressive symptoms, but she did not currently have any Prozac. (R. at 135.) On a musculoskeletal exam, there was

-12-

tenderness in the cervical spine at about the C5-6 area with some paraspinal muscle tenderness. (R. at 135.) Bentley had good range of motion and was neurologically intact. (R. at 135.) Looney assessed Bentley with shortness of breath, chest pain, hyperlipidemia, malaise, allergic rhinitis, acute sinusitis, cough and neck pain. (R. at 135.) An EKG was unremarkable, and Bentley had normal sinus rhythm. (R. at 135.) Looney gave Bentley a bottle of Singular and prescribed Prozac. (R. at 135-36.)

On August 19, 2003, Bentley returned to Stone Mountain complaining of a cough and congestion that had lasted for the past four days. (R. at 134.) The cough was nonproductive, and there was no wheezing or shortness of breath. (R. at 134.) A chest exam revealed a few scattered bronchi with adequate air entry with equal excursion, bilaterally. (R. at 134.) Looney assessed Bentley with acute bronchitis and bronchospasms and gave her Levaquin samples and Bidex DM. (R. at 134.) Bentley also was instructed to continue the use of Singulair and Albuterol. (R. at 134.)

On October 9, 2003, Bentley once again visited Stone Mountain complaining of a cough. (R. at 133.) She was assessed with shortness of breath, nausea, vomiting, GERD and a cough. (R. at 133.) Bentley's prescribed dosage of Nexium was increased, and she was instructed to avoid eating dairy products as a means of preventing further stomach problems. (R. at 133.) Bentley also was scheduled for an H. pylori test and a pulmonary function test. (R. at 133.)

Bentley underwent a psychological evaluation by Sharon J. Hughson, Ph.D., on referral from Disability Determination Services on November 3, 2003. (R. at 127-

-13-

31.) During the exam, Bentley denied having problems relating to others in a work environment or any judgment or insight problems. (R. at 131.) Bentley also denied any personal problems or chronic pain that would interfere with predictability and reliability. (R. at 131.) Hughson recommended that Bentley was able to manage her own funds and capable of following work rules. (R. at 131.) Hughson reported that Bentley could function independently and maintain overall attention and concentration. (R. at 131.) Hughson also reported that while Bentley could manage detailed simple instructions, she might have difficulty with complex job instructions. (R. at 131.) Hughson concluded that work stresses would increase Bentley's chronic pain and diagnosed Bentley with a pain disorder associated with both psychological factors and a general medical condition (chronic neck pain). (R. at 131.)

Hughson completed a Medical Assessment of Ability to do Work-Related Activities (Mental). (R. at 149-51.) Hughson indicated that in making occupational adjustments, Bentley would be unlimited in her ability to relate to co-workers, deal with the public, use judgment, interact with supervisors and function independently. (R. at 149-50.) Hughson also found that Bentley would have a good ability to follow work rules and maintain attention and concentration but would have a poor ability to handle work stresses. (R. at 149-50.) In evaluating Bentley's ability to make performance adjustments, Hughson found that Bentley would have a good ability to understand, remember and carry out simple job instructions, a fair ability to understand, remember and carry out detailed instructions and a poor ability to understand, remember and carry out complex job instructions. (R. at 50.) Hughson also determined that in making personal and social adjustments, Bentley would be unlimited in her ability to maintain her personal appearance and behave in an emotionally stable manner but would have a poor ability to relate predictably in social situations and demonstrate reliability. (R. at 150.) Hughson found no limitations on

-14-

Bentley based upon alcohol or drug abuse and determined that Bentley could manage benefits in her own best interest. (R. at 151.)

On December 18, 2003, Bentley returned to Stone Mountain complaining of chest pain. (R. at 162.) Bentley stated that the pain would occur approximately twice a week and would sometimes radiate down her arm and into her jaw. (R. at 162.) Bentley also stated that the pain sometimes made her feel short of breath, nauseated and diaphoretic. (R. at 162.) An EKG was performed, which revealed normal sinus rhythm and nonspecific ST/T wave changes. (R. at 162.) Looney reported that Bentley suffered from chest pain, allergic rhinitis, cough and GERD. (R. at 162.) Looney placed Bentley on Clarinex, Nasacort Nasal Spray, Nexium and nitroglycerin sublingual. (R. at 162.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2005); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2005). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2005).

-15-

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy the burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2) (West 2003); 42 U.S.C.A. § 1382c(a)(3)(A)-(B) (West 2003); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated March 19, 2004, the ALJ denied Bentley's claim. (R. at 14-21.) The ALJ found that Bentley was insured for DIB purposes through the date of the decision. (R. at 20.) Furthermore, the ALJ found that Bentley had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 20.) The ALJ found that the medical evidence established that Bentley suffered from a severe impairment but that Bentley did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 20.) The ALJ also found that Bentley's allegations regarding her limitations were not totally credible. (R. at 20.) After considering all of the medical opinions in the record regarding the severity of Bentley's impairment, the ALJ found that Bentley had the residual functional capacity to perform medium exertion. (R. at 20.) Based on Bentley's residual functional capacity, the ALJ found that Bentley was able to perform her past relevant work as both a stocker and sewing machine operator. As such, Bentley was not under a disability as defined by the Act at any time through the date of the decision and not eligible for benefits. (R. at 20.)

*See* 20 C.F.R. §§ 404.1520(f), 416.920(f) (2005)

Bentley argues the ALJ's decision was not based on the substantial evidence of the record. (Motion For Summary Judgment And Memorandum Of Law On Behalf Of The Plaintiff, ("Plaintiff's Brief"), at 5.) Specifically, Bentley argues that the ALJ failed to give proper weight to the psychological opinions of Hughson, as detailed in her December 12, 2003, assessment. (Plaintiff's Brief at 5.) Bentley further argues that substantial evidence does not support the ALJ's finding that she did not suffer from a severe mental impairment. (Plaintiff's Brief at 8.) Lastly, Bentley argues that the ALJ erred in failing to consider the combined effect of all of her impairments on her ability to work. (Plaintiff's Brief at 8-9.)

The court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the

-17-

wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

Bentley argues that the ALJ erred in his findings regarding her alleged mental impairment. In particular, she argues that the ALJ erred in failing to find that she suffered from a severe mental impairment and in rejecting the findings of Hughson that are contained in the PRTF and the Medical Assessment of Ability to do Work-Related Activities both dated December 12, 2003. (Plaintiff's Brief at 5.) I will first address whether the ALJ erred in rejecting Hughson's opinions.

The ALJ must consider objective medical facts and the opinions and diagnoses of both treating and examining medical professionals, which constitute a major part of the proof of disability cases. *See McLain v. Schweiker*, 715 F.2d 866, 869 (4th Cir. 1983). Also, "if a physician's opinion is not supported by the clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996). It should be noted that Hughson only evaluated Bentley on one occasion, and, therefore, should not be considered as a treating mental health provider.

As stated above, the ALJ must consider the objective facts for himself in making such a determination. The ALJ found that the medical evidence of record did not support Hughson's assessment and found that her conclusion was too restrictive and inconsistent with Bentley's testimony concerning her pain and the fact that it was

-18-

relieved with medication. (R. at 18, 186, 189-90, 192, 195.) Furthermore, the ALJ noted that Hughson is a psychologist and not qualified to assess or quantify pain. (R. at 18.)

In analyzing Bentley's depressive symptoms, the ALJ also noted that they were successfully treated with medication from her treating physician, as opposed to a mental health professional. (R. at 10, 18, 118, 135.) As the Fourth Circuit has ruled, "if a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Circuit 1986).

For these reasons, this court finds that the ALJ's decision to reject Hughson's opinion as to Bentley's work-related abilities is supported by substantial evidence in the record.

Bentley also argues that substantial evidence does not exist in the record to support the ALJ's finding that she did not suffer from a severe mental impairment. (Plaintiff's Brief at 8.) The Social Security regulations define a "non-severe" impairment as an impairment that does not significantly limit a claimant's ability to do basic work activities. *See* C.F.R. §§ 404.1521(a), 416.921(a) (2005). Basic work activities include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding, carrying out and remembering job instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations and dealing with changes in a routine work setting. *See* 20 C.F.R. §§ 404.1521(a), 416.921(b) (2005). The Fourth Circuit has held that "[a]n impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would

-19-

not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." *Evans v. Heckler* 734 F.2d 1012, 1014 (4th Cir. 1984) (quoting *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)) (citations omitted).

The court finds that substantial evidence supports the ALJ's ruling that Bentley does not suffer from a severe mental impairment. Although Bentley included a litany of medical problems in her testimony at the hearing, she failed to include depression as one of her ailments. (R. at 185-97.) To the contrary, Bentley has indicated that Prozac successfully treats her depression. (R. at 100, 135.) Since Prozac treats Bentley's depression, she has not sought professional help for her alleged mental impairment. Based on the fact that Bentley's depression is successfully treated with medication prescribed by her treating physician, it is a slight abnormality with a minimal effect on her life and no effect on her ability to perform basic work activities. The ALJ also found no indication in the record that Bentley had memory problems which resulted in significant limitations of functioning. (R. at 18.) The ALJ determined that Bentley's allegations of memory impairment were not credible. (R. at 18.) Thus, the ALJ properly found that Bentley does not suffer from a severe mental impairment.

Bentley also argues that the ALJ failed to consider the combined effect of her impairments on her ability to work. (R. at 8-9.) An ALJ must consider the combined effect of a claimant's impairment to determine "whether an individual's impairments are of sufficient severity to prohibit basic work related activities." *Hines v. Bowen*, 872 F.2d 56, 59 (4th Cir. 1989) (per curium) (citing *Reichenbach v. Heckler*, 808 F.2d 309, 312 (4th Cir. 1985)). Additionally, "the ALJ must adequately explain his or her evaluation of the combined effect of impairments." *Reichenbach*, 808 F.2d at 312.

-20-

The court finds that the ALJ adequately considered the combined effect of all of Bentley's impairments on her ability to work, including her alleged mental impairment. Bentley's argument hinges on the allegation that the ALJ did not accord due weight to her mental impairments. (Plaintiff's Brief 8.) However, as the court previously found, the ALJ properly rejected Hughson's assessment and determined that Bentley did not suffer from a severe mental impairment. The ALJ documented and thoroughly described each of Bentley's medical visits in his evaluation, including each alleged ailment. (R. at 16-18.) He then explained why each ailment was not disabling. (R. at 16, 18.) He found that Bentley's leg and arm pain was nonsevere because there had been no treatment or mention of such problems in the medical record since December 23, 2002. (R. at 16.) The ALJ determined that Bentley's depression had no significant limitation on her functioning because it was successfully treated with medication from her treating physician. (R. at 18.) The ALJ also found no indication in the record that Bentley has a memory problem which results in a significant limitation on functioning. (R. at 18.) Lastly, the ALJ determined that Bentley's neck pain was not disabling because she could perform routine activities and had no allegation of pain that was sufficiently severe to prevent her from performing medium work-related tasks. (R. at 18.) Since the ALJ adequately addressed each of Bentley's ailments, he properly considered the combined effect of her impairments on her ability to work.

-21-

*IV. Conclusion*

For the foregoing reasons, I will grant the Commissioner's motion for summary judgment, deny Bentley's motion for summary judgment and affirm the Commissioner's decision denying benefits.

An appropriate order will be entered.

DATED:     This *19ᵗʰ* day of September, 2005.

_____
SENIOR UNITED STATES DISTRICT JUDGE

-22-